# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, DEPARTMENT OF FINANCE, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0985-JTL |
| AT&T INC., | ) ) | |
| Defendant. | ) | |

## OPINION

Date Submitted: June 3, 2020
Date Decided: July 10, 2020

Melanie K. Sharp, Martin S. Lessner, Mary F. Dugan, Michael Laukaitis, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Counsel for Plaintiff.*

Brian M. Rostocki, Benjamin P. Chapple, REED SMITH LLP, Wilmington, Delaware; Sara A. Lima, REED SMITH LLP, Philadelphia, Pennsylvania; R. Gregory Roberts, REED SMITH LLP, New York, New York; *Counsel for Defendant.*

**LASTER, V.C.**

Escheat is a procedure by which "a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears." *Texas v. New Jersey*, 379 U.S. 674, 675 (1965). Title 12, Chapter 11, Subchapter II of the Delaware Code, titled "Unclaimed Property," requires that a person holding property that meets certain requirements file a report identifying the property and escheat it to the State. *See* 12 *Del. C.* §§ 1130–1190. Because the subchapter contemplates escheat, it is frequently called the "Escheat Law."

The Escheat Law designates the Secretary of Finance (or the Secretary's delegate) as the "State Escheator."[1] The Escheat Law charges the State Escheator with administering and enforcing the Escheat Law and authorizes the State Escheator to conduct examinations of companies' books and records to determine whether they have complied with the statutory requirements.

Acting on behalf of the State Escheator, the Department of Finance began examining the books and records of AT&T, Inc. Except for two categories of information, AT&T agreed to produce the information that the Department sought. On November 8, 2019, the Department issued an administrative subpoena for the two

---

[1] *See* 12 *Del. C.* § 1102 ("There shall be an Escheator of the State, who shall be the Secretary of Finance or the Secretary's delegate. The administration and enforcement of this chapter are vested in the Secretary of Finance or the Secretary's delegate."); 30 *Del. C.* § 363 ("The Secretary of Finance shall act as Escheator of the State under the provisions of Chapter 11 of Title 12."); *see also* 12 *Del. C.* § 1130(23) ("'State Escheator' means the person responsible for the administration and enforcement of this chapter, as established by § 1102 of this title and § 363 of Title 30.").

categories of information. AT&T refused to comply and filed an action against the State Escheator and two other state officials in the United States District Court for the District of Delaware (respectively, the "Federal Action" and the "Delaware District Court"). There, AT&T contends that the officials took actions that violated federal law and the United States Constitution.

The Department responded by filing this action to enforce the subpoena. AT&T did not answer the complaint; it responded instead with a motion to stay this action or to modify or quash the subpoena. In its singular motion, AT&T requested three types of relief, each of which implicates a different legal framework.

First, AT&T asked to stay this action in favor of the Federal Action. Recent precedent teaches that the enforceability of the administrative subpoena raises issues of state law that could moot or otherwise affect the federal and constitutional analysis. As a matter of judicial efficiency, this action should go first. The request for a stay is denied.

Second, AT&T argued that AT&T's affiliates are necessary parties who must be joined if this action is to proceed. AT&T controls its affiliates, and the Escheat Law authorizes the State Escheator to obtain records from subsidiaries and affiliates. AT&T has always filed reports and interacted with the State Escheator on behalf of its affiliates. In this action, AT&T can raise arguments on behalf of its affiliates and protect their interests. If the subpoena is enforced, then AT&T can cause its affiliates to comply. The affiliates therefore are not indispensable parties, and the request to join AT&T's affiliates is denied.

2

Third, AT&T asked that the subpoena be quashed or modified because the Department exceeded the authority granted to the State Escheator under the Escheat Law. This motion raises procedural and substantive issues of first impression. This decision holds that the Escheat Law granted the State Escheator the authority to issue the subpoena, which the Department exercised. That, however, is not the end of the analysis. Precedents governing the enforcement of administrative subpoenas in other contexts recognize that a court may decline to enforce a subpoena that is technically authorized if doing so would represent an abuse of the court's process. In this case, AT&T has met its burden to show that the scope of the subpoena is so expansive that enforcement would constitute an abuse. Although the court could have permitted the Department to supplement the record with an additional explanation as to why the subpoena should be enforced, the Department eschewed that opportunity, insisting that it wanted the court to issue a final, appealable order.

This court could also modify the subpoena. Only AT&T proposed modifications, and its limitations tracked its arguments regarding the scope of the State Escheator's legal authority, which this decision rejects. The Department should be given the opportunity in the first instance to frame a narrower subpoena. This decision therefore quashes the subpoena in its current form.

## I.     FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with AT&T's motion.

3

## A. The Examination

AT&T is a Delaware corporation headquartered in Dallas, Texas. Since 1999, AT&T has filed unclaimed property reports with the State Escheator on a consolidated basis with thirty-three of its affiliates (the "Affiliates"). For simplicity, except where necessary to address AT&T's argument about joining necessary parties under Court of Chancery Rule 19, this decision refers only to AT&T. *See* Part II.B., *infra*.

On January 12, 2012, the Department notified AT&T that it intended to examine AT&T's books and records to confirm that it was complying with the Escheat Law. Compl. Ex. A. The Department designated Kelmar Associates LLC as its agent to conduct the review. The Department generally uses Kelmar to conduct audits and pursue escheatable property, and Kelmar receives as compensation a percentage of the escheated property. *See* Dkt. 10 at 7. The fact that Kelmar is compensated contingently has obvious implications, beneficial and otherwise, for its incentives to investigate companies, pursue escheatable property, and obtain favorable settlements.

On February 10, 2012, Kelmar sent AT&T an initial document request. Compl. ¶ 16. Over the next several years, Kelmar sent AT&T additional requests.

The parties refer to one of the requests as the "Rebates Request." *Id.* Ex. J Ex. 2; *see id.* ¶ 17. It asks AT&T to identify all general ledger accounts used by AT&T since 1992 "to track its rebate accrual and expense activity along with the period of time . . . each account was utilized to track this activity." *Id.* Ex. J Ex. 2 at 2. The Rebates Request also asks AT&T to identify each third-party administrator that it used to issue rebates to

4

consumers. *Id.* The Department thus seeks records going back twenty years from the commencement of the audit.

**B.    The *Temple-Inland* Ruling**

In June 2016, the Delaware District Court issued its ruling in *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527 (D. Del. 2016). In that decision, the Delaware District Court granted summary judgment in favor of Temple-Inland, Inc., holding that Delaware's then-prevailing methods of auditing companies for and collecting unclaimed property violated the substantive due process clause of the United States Constitution.

Like AT&T, Temple-Inland was a Delaware corporation with its principal place of business in Texas. In 2008, the State Escheator notified Temple-Inland that it was commencing an audit to determine whether there were deficiencies in its reporting and escheating of unclaimed property during the previous twenty-two years—from January 1986 until December 2007. *Id.* at 531–32. The State Escheator recognized, and the record in the *Temple-Inland* case established, that a standard records retention policy is typically seven years. *Id.* at 534. As in this case, Kelmar conducted the audit for the State Escheator and would be compensated on a contingent basis with a percentage of the escheated property. *Id.*

The audit focused on Temple-Inland's issuance of checks for accounts payable and payroll. Temple-Inland was only able to produce complete records dating back to 2003 for accounts payable and dating back to 2004 for payroll. *Id.* Temple-Inland produced all of the unclaimed property reports it had filed in Delaware from 1998 to

5

2008, a couple of reports filed before 1998, and two audit reports filed in Texas covering 1985 until 2005. *Id.*

When a company lacks sufficient records for a period to determine whether property was subject to escheat, the State Escheator estimates the amount of abandoned property that the company should have escheated during that period. For Temple-Inland, the State Escheator estimated the amount of property subject to escheat for its accounts payables from 1986 to 2002 and for its payroll from 1986 to 2003. *Id.* at 535. The estimates resulted in amounts of abandoned property that were an order of magnitude higher than what Temple-Inland reported during the period for which records were available. *Id.* at 537–38.

Temple-Inland pursued an administrative appeal and secured only minor changes to the State Escheator's decision. Temple-Inland then filed suit in the Delaware District Court, contending the State Escheator's "audit and assessment of [Temple-Inland's] unclaimed property liability" violated federal law, including provisions of the United States Constitution. *Id.* at 541.

The Delaware District Court held that Temple-Inland was challenging a form of executive action that would violate federal substantive due process protections "'only when it shocks the conscience.'" *Id.* (quoting *Ecotone Farm LLC v. Ward*, 639 Fed. Appx. 118, 125 (3d Cir. 2016)). The Delaware District Court found that the following combination of factors, taken together, "shock[ed] the conscience" and resulted in a due process violation:

6

> [D]efendants[] (i) waited 22 years to audit plaintiff; (ii) exploited loopholes in the statute of limitations; (iii) never properly notified holders regarding the need to maintain unclaimed property records longer than is standard; (iv) failed to articulate any legitimate state interest in retroactively applying [the Delaware statute that permitted the use of estimation] except to raise revenue; (v) employed a method of estimation where characteristics that favored liability were replicated across the whole, but characteristics that reduced liability were ignored; and [(vi)] subjected plaintiff to multiple liability.

*Id.* at 550.

In response to the *Temple-Inland* ruling, the General Assembly amended the Escheat Law. *See* 81 Del. Laws ch. 1 (2017) (the "2017 Amendments"). Among other things, the 2017 Amendments authorized the subject of any then-pending examination to "notify the State Escheator of the person's intent to expedite the completion of the pending examination . . . ." 12 *Del. C.* § 1172(c)(1). If the subject of a then-pending examination opted to expedite its completion, then the State Escheator only has eighteen months from the triggering of the expedited examination to serve "[a]ll requests for records, testimony, and information." *Id.* § 1172(c)(3). The 2017 Amendments further provided that

> [i]f the person [triggering the expedited examination] responds within the time and in the manner established by the State Escheator to all requests for records, testimony, and information made by the person conducting the examination, the State Escheator shall complete the examination and provide an examination report . . . within 2 years from the date of receipt of the written notification and shall waive interest and penalty . . . .

*Id.* § 1172(c)(2). The 2017 Amendments gave the State Escheator "complete discretion" to determine whether the subject of the examination had "responded within the time and in the manner established." *Id.* § 1172(c)(4).

7

## C. The Expedited Examination

AT&T was subject to a pending examination when the General Assembly enacted the 2017 Amendments. AT&T was therefore entitled to "notify the State Escheator of [its] intent to expedite the completion of the pending examination . . . ." *Id.* § 1172(c)(1). On December 7, 2017, AT&T gave the requisite notice. *See* Dkt. 10 Exs. B, C.

On January 25, 2018, the Department acknowledged receipt of the notice and directed AT&T to work with Kelmar to submit an "agreed-upon detailed work plan" by February 2, 2018. *Id.* Ex. C sched. A. On Wednesday, January 31, Kelmar sent AT&T a proposed work plan. Given the obvious problems in reaching agreement on a work plan by that Friday, the Department extended the deadline to February 28. Kelmar and AT&T subsequently reached agreement on a work plan. *See id.* Ex. E (the "Work Plan").

The Work Plan divided the parties' efforts into three phases:

- a 430-day period during which AT&T would respond to Kelmar's requests and Kelmar would identify deficiencies,

- a subsequent 180-day period during which Kelmar would issue an interim report and AT&T would remediate discrepancies, and

- a subsequent 110-day period during which Kelmar would issue a final report and AT&T would again remediate discrepancies.

In agreeing to the Work Plan, AT&T reserved its rights, "including but not limited to any rights to challenge the audit process or to request modifications to the plan as the audit progresses." *Id.*

8

## D. Disputes Over AT&T's Production Of Records

Meanwhile, on January 17, 2018, Kelmar sent AT&T what the parties refer to as the "Disbursements Request." *See* Compl. Ex. J Ex. 1. It seeks information concerning every check AT&T had issued from twenty-seven accounts since June 1992. Complying with the request would require AT&T to identify each check issued, the general ledger account to which it was recorded, the disposition status, the payee name and address, and the amount. The Disbursements Request also seeks information concerning checks marked void, cleared, stopped, or void and reissued.

Over the next several months, AT&T worked with Kelmar to satisfy the information requests, including the Rebates Request and Disbursements Request. *See* Dkt. 10 Ex. F. On August 24, 2018, Kelmar asked AT&T to fulfill the Disbursements Request for an additional bank account. *See* Compl. Ex. J Ex. 1. On November 27, AT&T objected to the breadth of Kelmar's outstanding requests. Dkt. 10 Ex. G.

## E. The Notices Of Deficiencies

On July 26, 2018, the Department sent a reminder to AT&T that its failure to comply with the deadlines in the Work Plan could result in the State Escheator terminating the expedited examination. Compl. Ex. E. The Department sent virtually identical letters to AT&T on December 20, 2018, and March 6, 2019, and August 8, 2019. *See id.* Exs. F–H.

On May 9, 2019, the Department sent AT&T a notice identifying outstanding requests that had not been fulfilled. The Department warned AT&T that failing to comply

9

could result in termination of the expedited examination. *Id.* Ex. B. The Department sent nearly identical notices on September 19 and October 9. *See id.* Exs. C, D.

On October 31, 2019, the Department notified AT&T that the State Escheator had terminated the expedited examination. The notice demanded that AT&T produce documents responsive to the Rebates Request and the Disbursements Request and stated that failure to do so could lead to the issuance of an administrative subpoena. Compl. ¶ 31; *id.* Ex. I.

On November 8, 2019, the Department issued an administrative subpoena seeking production of documents responsive to the Rebates Request and the Disbursements Request by 9:00 a.m. on December 9. *See id.* Ex. J (the "Subpoena"). On November 27, AT&T again notified the Department that it objected to the requests on multiple grounds. Dkt. 10 Ex. H.

**F.     Litigation**

On December 6, 2019, AT&T filed the Federal Action against the State Escheator and two other Delaware officials—the Secretary of Finance and the Assistant Secretary of Finance. AT&T contends that by terminating the expedited audit and serving the Subpoena, the state officials (i) infringed on AT&T's right under the Fourth Amendment of the United States Constitution to be free from unreasonable searches and seizures, (ii) deprived AT&T of procedural due process rights protected by the Fourteenth Amendment, (iii) deprived AT&T of substantive due process rights protected by the Fourteenth Amendment, (iv) violated the Ex Post Facto Clause, and (v) violated the Takings Clause. AT&T further asserted that by focusing on large companies like AT&T,

10

the state officials violated the Equal Protection Clause. And AT&T argued that the aspects of the Escheat Law were void for vagueness and preempted by federal common law.

On December 10, 2019, the Department filed this action seeking an order compelling AT&T to comply with the Subpoena. On January 10, 2020, AT&T moved to stay the litigation in favor of the Federal Action or in the alternative, to quash or modify the Subpoena. In its proposed form of order, AT&T asked the court to narrow the Subpoena as follows:

- "The subpoena applies only to records related to transactions within the statute of limitations set out in 12 *Del. C.* § 1158(a) (2016). Therefore, the subpoena may seek only records for transactions dated eight years prior to the entry of this order, but in no case prior to 2008." Dkt. 18.

- "The subpoena applies only to records that reflect amounts outstanding which have remained unclaimed on the company's books and records for five years in accordance with 12 *Del. C.* § 1133. Therefore, the subpoena may only seek outstanding checks or checks voided, stopped, or cancelled after five years from issuance." *Id.*

- "The subpoena does not apply to records related to transactions issued to an apparent owner for which Defendant's records reflect an address in a state other than Delaware." *Id.*

## II.  LEGAL ANALYSIS

The Escheat Law authorizes the State Escheator "at reasonable times and on reasonable notice" to:

(1) Examine the records of a person or the records in the possession of an agent, representative, subsidiary, or affiliate of the person under examination in order to determine whether the person complied with [the Escheat Law].

11

(2) Take testimony of a person, including the person's employee, agent, representative, subsidiary, or affiliate, to determine whether the person complied with [the Escheat Law].

(3) Issue an administrative subpoena to require that the records specified in paragraph (1) of this section be made available for examination and that the testimony specified in paragraph (2) of this section be provided.

(4) Bring an action in the Court of Chancery seeking enforcement of an administrative subpoena issued under paragraph (3) of this section, which the Court shall consider under procedures that will lead to an expeditious resolution of the action.

12 *Del. C.* § 1171.

Acting on behalf of the State Escheator, the Department relied on Section 1171(1) when requesting information from AT&T. The Department relied on Section 1171(3) when issuing the Subpoena. And the Department relied on Section 1171(4) when filing this action "seeking enforcement of" the Subpoena.

The Escheat Law charges the court with considering the application "under procedures that will lead to an expeditious resolution of the action." This court has not established a special set of procedures.

The statue contemplates "an action in the Court of Chancery," and the Department commenced the action by filing a complaint. AT&T, however, did not respond to the complaint as a defendant normally would, such as by filing an answer or by moving to dismiss on grounds set forth in Court of Chancery Rule 12. AT&T instead docketed a "Motion to Stay, or in the Alternative, Quash or Modify Plaintiff's Administrative Subpoena." Dkt. 10 (the "Motion"). In its opening brief in support of the Motion, AT&T advanced three requests for relief, styling two as procedural and one as substantive. *See*

12

*id.* at 2–4. In the first procedural request, AT&T asked the court to stay this action in deference to the Federal Action. In the second procedural request, AT&T argued that the Affiliates are indispensable parties who must be joined before this action can continue. In its substantive request, AT&T also argued that by issuing the Subpoena, the Department exceeded the authority granted to the State Escheator under the Escheat Law.

AT&T's request for a stay presents a question governed by settled precedent that addresses motions of that type. Recent authority teaches that this action should proceed before the Federal Action, so the motion to stay is denied. *See generally Dept. of Fin. v. Univar, Inc.* (*Univar Chancery III*), 2020 WL 2569703 (Del. Ch. May 21, 2020).

AT&T's argument about the Department's failure to join the Affiliates raises an issue under Rule 19, which governs the joinder of indispensable parties. Relevant authority teaches that the Affiliates are not indispensable parties, so AT&T's request that this action be dismissed or stayed pending joinder is denied.

AT&T's request to quash or modify the Subpoena raises procedural and substantive issues of first impression. In the section of this memorandum opinion addressing that aspect of AT&T's motion, this decision explains the framework it applies.

## A.    The Request For A Stay

AT&T argues that this action should be stayed pending the outcome of the Federal Action. As the grounds for the stay, AT&T cites this court's "inherent power to manage its own docket, including the power to stay litigation on the basis of comity, efficiency, or simple common sense." *Paolino v. Mace Sec. Int'l, Inc.*, 985 A.2d 392, 397 (Del. Ch. 2009); *see Salzman v. Canaan Capital P'rs*, 1996 WL 422341, at *5 (Del. Ch. July 23,

13

1996) ("To enable courts to manage their dockets, courts possess the inherent power to stay proceedings."); *Phillips Petroleum Co. v. ARCO Alaska, Inc.*, 1983 WL 20283, at *4 (Del. Ch. Aug. 3, 1983) (granting stay in favor of pending arbitration based on "common sense"). AT&T contends that it would be inefficient for this action to proceed before the Federal Action because of the "possibility that the [Delaware District Court] will address the very claims at issue here." Dkt. 10 at 19.

Both AT&T and the Department rely on a series of decisions in a parallel action involving Univar, Inc., where both the Delaware District Court and this court considered whether a similar federal action should take precedence over a comparable state proceeding. The early rounds in that action supported AT&T's request for a stay. This court stayed the Department's action to enforce an administrative subpoena in favor of the federal challenge. *See Dept. of Fin. v. Univar, Inc.*, C.A. No. 2018-0884-JRS, at 45 (Del. Ch. Apr. 8, 2019) (TRANSCRIPT). This court declined to certify the ruling for interlocutory appeal, *see Dept. of Fin. v. Univar, Inc.*, 2019 WL 1995150, at *4 (Del. Ch. May 6, 2019), and the Delaware Supreme Court agreed that an interlocutory appeal was not warranted, *see Dept. of Fin. v. Univar, Inc.*, 2019 WL 2513772, at *2 (Del. June 18, 2019) (ORDER).

Four months later, the Delaware District Court dismissed as unripe all but two of the ten counts in Univar's federal complaint because this court had not yet determined whether to enforce the administrative subpoena. *Univar, Inc. v. Geisenberger*, 409 F. Supp. 3d 273, 281–82 (D. Del. 2019). The Delaware District Court held that Univar's equal protection and procedural due process claims were ripe, but the court stayed those

14

claims pending the outcome of the proceeding to enforce the administrative subpoena. *Id.* at 281, 285. The court explained that a stay was "in the interest of justice" and that

> the best course of action is to stay this case until such a time that the Court of Chancery determines whether to enforce the Subpoena against Plaintiff. If the Chancery Court does not enforce the Subpoena, this action may no longer be necessary. On the other hand, if the Subpoena is enforced, certain issues may become ripe and an amended complaint may be appropriate. The Court recognizes that certain abstention doctrines may come into play, but believes that as a matter of comity, it would be well if Delaware had the opportunity to address some of these issues in the first instance. Thus, the present litigation before this Court is stayed until the enforceability of the subpoena against Univar has been addressed.

*Id.* at 284–85 (citation, footnote, and internal quotation marks and alterations omitted).

After the Delaware District Court issued its decision, this court lifted the stay, and Univar moved to dismiss the Department's claim as unripe. This court denied the motion and instructed the parties that "the next step is to present the claim for decision on the merits promptly." *See Univar Chancery III*, 2020 WL 2569703, at *5.

The sequence of rulings in the *Univar* litigation demonstrates that this action should proceed. A stay would create inefficiencies and waste judicial resources, because the issues before the Delaware District Court largely will remain unripe until this court has ruled on whether to enforce the Subpoena. As to those claims that are ripe, the Delaware District Court has expressed a preference that this court first decide whether the Subpoena is enforceable. This approach comports with the general principle that "[w]here the constitutionality of a state statute . . . is involved, there are sound reasons why any uncertainty as to its meaning should first be resolved by the state." *Jehovah's Witnesses*

15

*v. King Cty. Hosp. Unit No. 1 (Harborview)*, 278 F. Supp. 488, 505 (W.D. Wash. 1967), *aff'd*, 390 U.S. 598 (1968).

AT&T seeks to distinguish the outcome in *Univar* on the theory that its federal challenge to the termination of its expedited examination is ripe, regardless of any challenge to the scope of the Subpoena. The two issues are not separate. The State Escheator terminated the expedited examination because AT&T failed to comply with the Department's requests for information. If this court holds that the Department exceeded the authority granted to the State Escheator under Delaware law by making those requests, then that ruling could affect whether the State Escheator had grounds for terminating the expedited examination.

AT&T also cites three similar challenges to the Escheat Law that are pending in the Delaware District Court. Dkt. 10 at 18–19 (first citing *Eaton Corp. v. Geisenberger*, C.A. No. 1:19-cv-02269-RGA (D. Del. Dec. 12, 2019); then citing *Fruit of the Loom, Inc. v. Geisenberger*, C.A. No. 1:19-cv-02273-CFC (D. Del. Dec. 13, 2019); and then citing *Siemens USA Hldgs. Inc. v. Geisenberger*, C.A. No. 1:19-cv-02284-MN (D. Del. Dec. 17, 2019)). AT&T argues that the overlapping issues in those cases should be decided first, before this court addresses the enforceability of the Subpoena. This is a variant of the argument that was rejected in the *Univar* litigation. The Delaware District Court has already indicated that this court should go first, and this court has agreed.

Alternatively, AT&T contends that the case should be stayed because AT&T made a so-called "*England* reservation." *See generally England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411 (1964). The *England* reservation preserves AT&T's ability to

16

litigate federal claims related to this action in federal court. It does not affect whether this litigation should be stayed. If anything, it counsels in favor of this action going first, because AT&T has preserved its federal claims.

Staying this action in favor of the Federal Action would be inefficient. This litigation involves the narrow question of whether the Subpoena is enforceable. Answering this question will affect the analysis of the constitutional questions at issue in the Federal Action. The request for a stay is denied.

## B. The Failure To Join Necessary Parties

AT&T next argues that the Subpoena should be quashed because the Affiliates are necessary parties who must be joined as defendants before this court can enforce the Subpoena. Alternatively, AT&T contends that this court should "order [the Department] to join in this action all other legal entities from which it seeks documents," namely the Affiliates. Dkt. 10 at 22.

AT&T's request for relief is the equivalent of a motion to join necessary parties under Rule 19. That rule provides that joinder of a party is necessary if

(1) in the person's absence complete relief cannot be accorded among those already parties, or

(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may

(i) as a practical matter impair or impede the person's ability to protect that interest or

(ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

17

Ch. Ct. R. 19(a) (formatting altered).

Invoking the standard set out in Rule 19(a)(1), AT&T contends that this court cannot grant complete relief unless the Affiliates are joined as necessary parties because this court cannot order non-parties to comply with the Subpoena. That is not so. This court can order AT&T to cause the Affiliates to comply with the Subpoena. AT&T controls the Affiliates, and it can cause them to comply with an order of this court.

The Escheat Law expressly authorizes the enforcement of a subpoena against a "subsidiary or affiliate" of a person under examination. Section 1171 authorizes the State Escheator to "[e]xamine the records of a person or the records in the possession of an agent, representative, subsidiary, or affiliate of the person under examination in order to determine whether the person complied with [the Escheat Law]." 12 *Del. C.* § 1171(1). The statute authorizes the State Escheator to "[i]ssue an administrative subpoena to require" the production of these records. *Id.* § 1171(3). The statute also authorizes the State Escheator to bring an action in this court to enforce the administrative subpoena. *Id.* § 1171(4). If there were any question about this court's ability to order AT&T to cause the Affiliates to comply with the Subpoena, the Escheat Law answers it.

AT&T's conduct also demonstrates that the Affiliates are not necessary to provide complete relief. For the past two decades, AT&T has filed consolidated reports on behalf of itself and the Affiliates. *See* Dkt. 10 at 9, 26. For the past eight years, AT&T has participated in the examination on behalf of itself and the Affiliates. In responding to the requests, AT&T has relied on in-house counsel at one of the Affiliates to act on AT&T's behalf. *See id.* at 13–14; *see also id.* Exs. G, H. AT&T has never previously objected that

18

the Affiliates are technically separate entities or that it lacks the ability to control or provide information on behalf of the Affiliates. The joinder of the Affiliates as parties is not necessary for this court to grant complete relief. Only AT&T's presence is necessary for this court to grant complete relief.

Separately invoking the language of Rule 19(a)(2), AT&T claims that joining the Affiliates is necessary to enable the Affiliates to produce information without running afoul of "any laws or regulations that could prohibit disclosure absent such a court order directed to the particular entity." Dkt. 10 at 22. AT&T does not identify what laws or regulations might apply, making this a hypothetical concern.

In any event, AT&T is the real party in interest. AT&T controls the Affiliates, and AT&T is fully capable of raising any issues and advocating on their behalf. The joinder of the Affiliates as parties is not necessary to protect their interests or to avoid duplicative obligations. *See Actrade Fin. Techs. Ltd. v. Aharoni*, 2003 WL 22389891, at \*7 (Del. Ch. Oct. 17, 2003) ("There is also little risk that these companies will be unable to protect their interests or that Aharoni will be subject to duplicative obligations. If, as alleged, Aharoni controls ICC, Fort and CFI, then Aharoni can adequately defend their interests.").

It is not necessary to stay or dismiss this action because the Affiliates are not parties. AT&T's request for relief under Rule 19 is denied.

## C.     The Request To Quash Or Modify The Subpoena

AT&T finally contends that the Subpoena should be quashed or modified because the Department has not properly exercised the authority granted to the State Escheator

19

under the Escheat Law. AT&T advances six arguments as to why the Subpoena is not a proper exercise of authority. First, AT&T argues that the Department's stated reasons for issuing the Subpoena do not match the language of the statute. Second, AT&T argues that the Department is seeking information for reporting periods that cannot give rise to any escheatable property because the statute of limitations has already run. Third, AT&T argues that the Department is seeking information about transactions where AT&T's records show that the property could not possibly be escheatable to Delaware. Fourth, AT&T argues that the Department is seeking information about voided or cleared checks that are not yet escheatable. Fifth, AT&T argues that the Subpoena requires AT&T to create new documents. Finally, AT&T argues that even if the requests might be technically authorized, the Department's demands for information are "'so obviously pretextual or insatiable'" as to extend "'beyond a legitimate inquiry.'" Dkt. 10 at 23 (quoting *Marathon Petroleum Corp. v. Sec'y of Fin.*, 876 F.3d 481, 501 (3d Cir. 2017)).

As noted previously, the Delaware courts have not yet addressed the procedures that should govern an action to enforce a subpoena issued under the Escheat Law. Section 1171(4) authorizes the State Escheator to "[b]ring an action in the Court of Chancery seeking enforcement of [the Subpoena]," and it instructs the court to consider that request for relief "under procedures that will lead to an expeditious resolution of the action." 12 *Del. C.* § 1171(4).

The statutory reference to an "action in the Court of Chancery" indicates that a proceeding to enforce a subpoena is governed by the Court of Chancery rules. Like the Federal Rules of Civil Procedure, the Court of Chancery rules dispense with the prior

20

systems of forms of action, common law writs, and code pleading. There is only "1 form of action to be known as 'civil action.'" Ch. Ct. R. 2.

A party confronted with a complaint ordinarily responds by filing an answer or a motion to dismiss. AT&T filed a singular motion that made pleading-stage arguments (the request for a stay in deference to the Federal Action and the request for a stay or dismissal under Rule 19) and also included a motion to quash or modify. Under the Court of Chancery Rules, a motion to quash or modify is not a motion to dismiss. It is a discovery motion analogous to a motion for a protective order that is filed in response to a subpoena issued pursuant to Court of Chancery Rule 45. *See* Ch. Ct. R. 45(c)(3)(A) ("On timely motion, the court on behalf of which the subpoena was issued shall quash or modify the subpoena . . . .").

A party who moves to quash or modify a subpoena generally takes on the burden to establish that a subpoena exceeds the scope of proper discovery.[2] Rule 45(c)(3)(A) identifies possible grounds, including that the subpoena

---

[2] *See Tekstrom, Inc. v. Savla*, 2007 WL 3231632, at *5 (Del. Com. Pl. Oct. 25, 2007) ("As a rule, the moving party seeking to quash or modify a subpoena bears the burden in obtaining the desired remedy."); 9A Charles Allen Wright et al., *Federal Practice and Procedure* § 2463.1 (3d ed.), Westlaw (database updated Apr. 2020) (explaining that under the federal analogue of Court of Chancery Rule 45(c)(3)(A), "the burden to establish that a subpoena duces tecum imposes an undue burden is on the person who moves to have it quashed"); *cf. Drysdale v. Noble*, 2003 WL 21481005, at *2 (Del. Super. June 19, 2003) ("[A] party seeking an order protecting confidential trade information bears the burden of establishing good cause for the order by showing specifically that it will be harmed by disclosure." (internal quotation marks and alterations omitted)); 23 Am. Jur. 2d *Depositions and Discovery* § 62 ("The party seeking a protective order bears the burden of demonstrating the requisite good cause.").

21

(i) Fails to allow reasonable time for compliance;

(ii) Requires disclosure of privileged or other protected matter and no exception or waiver applies; or

(iii) Subjects a person to undue burden.

Ch. Ct. R. 45(c)(3)(A); *see id.* 45(c)(3)(B) (providing additional bases to quash or modify a subpoena seeking disclosure of trade secrets or expert opinion). A party might seek to quash or modify an administrative subpoena on similar grounds, and a party seeking to do so would logically bear the burden to establish a fact-based objection of this type.

By moving affirmatively to quash or modify the Subpoena, AT&T could be seen as taking on a burden to show that the Subpoena was improper. But in the Motion and its supporting briefs, AT&T appeared to advance only pleading-stage challenges to the Department's authority to issue the Subpoena. At oral argument, the court asked AT&T's counsel whether some form of further proceedings would be warranted if those challenges failed. AT&T's counsel did not seem to have contemplated further proceedings, but agreed it was possible. Dkt. 30 at 11–13, 19.

To the extent that the filing and framing of the Motion muddied the procedural waters, the Department's response did not help clarify them. The Department did not respond to the Motion by cross moving for affirmative relief, such as by filing a motion for judgment on the pleadings or a motion for summary judgment. The Department only filed an answering brief. Dkt. 16. At oral argument, the Department maintained that in an action to enforce an administrative subpoena, the only pleading is a complaint, the standard response is a motion to quash, and that based on that record, this court must

22

make a decision that would result in a "final, appealable order" regarding the administrative subpoena. Dkt. 30 at 61; *see id.* at 34–37, 39–42; *see also* Dkt. 25 at 5.

The Department's procedural position has little to recommend it. It conflicts with the Department's assertion in its answering brief that "this proceeding is analogous to a summary proceeding seeking examination of a Delaware corporation's books and records pursuant to 8 *Del. C.* § 220." Dkt. 16 at 7. A Section 220 proceeding does not leap from the filing of a complaint and the equivalent of a pleading-stage motion to the issuance of a final, appealable order. Like any other civil action, a Section 220 proceeding starts with pleadings and culminates in a merits hearing that enables the court to enter final relief, often after a short trial on a paper record. *See, e.g.*, *Lavin v. West Corp.*, 2017 WL 6728702, at *1 (Del. Ch. Dec. 29, 2017) (rendering post-trial decision on a "'paper record' without depositions or live testimony"). Because the statute calls for the proceeding to be summary, the court takes steps to streamline the proceeding and accelerate the merits hearing and motion practice in a Section 220 proceeding is disfavored.[3] But the responding party in a Section 220 proceeding typically files an

---

[3] *See La. Mun. Police Empls. Ret. Sys. v. Morgan Stanley & Co., Inc.*, 2011 WL 773316, at *3 (Del. Ch. Mar. 4, 2011) ("The summary nature of [a Section 220] proceeding 'dictate[s] against allowing preliminary motions addressed to the pleadings to be presented and decided. . . . Such a practice would tend to promote delay, thereby undercutting the statutory mandate and policy that the proceeding be summary in character.'" (quoting *Coit v. Am. Century Corp.*, 1987 WL 8458, at *1 (Del. Ch. Mar. 20, 1987))); *Lavi v. Wideawake Deathrow Entm't, LLC*, 2011 WL 284986, at *1 (Del. Ch. Jan. 18, 2011) ("Rarely is dispositive motion practice efficient when the case can be tried within two months of filing."); *Coit*, 1987 WL 8458, at *1 (explaining that pretrial

23

answer, limited discovery is available, and the case follows a standard, albeit accelerated, procedural track. If a Section 220 proceeding is the proper analogy, then the Department's position at oral argument is mistaken.

The Department's position also conflicts with the implications of Delaware precedent regarding the enforcement of administrative subpoenas in other settings. In *First Jersey Securities, Inc. v. Bruton*, 1980 WL 273543 (Del. Ch. Mar. 6, 1980), the Delaware Division of Securities issued an administrative subpoena to examine an employee of First Jersey Securities, Inc. First Jersey filed an action in the Court of Chancery against Donald Bruton, then Securities Commissioner of the State of Delaware. First Jersey asked the court to quash the subpoena and sought to have any discovery governed by the rules of this court. Chancellor Marvel agreed that "once the opposing contentions of the opposing parties are drawn into the Court of Chancery for decision, it is clear that the rules of this court must apply . . . ." *Id.* at *1.

After the Securities Commissioner moved for reargument, Chancellor Marvel reiterated that "when an administrative proceeding reaches an adjudicatory stage, the full panoply of judicial procedures must be observed by an administrative agency." *First Jersey Sec., Inc. v. Bruton*, 1980 WL 273547, at *1 (Del. Ch. May 8, 1980). Chancellor Marvel noted that by statute, "'[n]othing in this Code, anything therein to the contrary notwithstanding, shall in any way limit, supersede or repeal any rule heretofore

_____

motions in a Section 220 action "ought not to be presented for decision in advance of the final hearing on the merits except where necessary to avoid substantial prejudice").

promulgated governing practice or procedure in the Court of Chancery.'" *Id.* at *1 (quoting 10 *Del. C.* § 361(d)). As a result, the Court of Chancery Rules prevailed over any contrary statute for purposes of governing a court proceeding. Chancellor Marvel also held that the standards set forth in Court of Chancery Rule 26 would govern First Jersey's request to quash the subpoena. *See id.* at *2.

The Department's argument that the proceedings on AT&T's motion to quash must result in a final, appealable order also runs contrary to *In re Blue Hen Country Network, Inc.*, 314 A.2d 197 (Del. Super. 1973). There, the Attorney General filed an action to enforce an administrative subpoena as part of an investigation into securities fraud. The Attorney General petitioned for a rule to show cause as to why the subpoena should not be enforced, and the responding parties filed motions to quash and for a protective order. *Id.* at 199. The trial court largely enforced the subpoena, but found it unclear whether certain types of documents "would contain information relevant to the investigation." *Id.* at 202. The trial court ordered the Attorney General to "submit justification for the production of those records." *Id.* The trial court thus requested additional information and conducted further proceedings; it did not immediately issue a final order.

The Department's position even departs from how federal decisions describe the operative procedure for enforcing an administrative subpoena. The United States Court of Appeals for the Third Circuit recommended the following "generally acceptable procedure":

1. The Secretary or his delegate would file a complaint accompanied by an affidavit of the agent who issued the summons, seeking enforcement. The complaint should separately allege compliance with each of the requirements of the Powell test of enforceability.[4] The affidavit should support these allegations.

2. Process on the complaint could be in the form of an order served on the person summoned fixing a deadline for filing any responsive pleading, albeit an informal pleading, together with an affidavit, and any motions, and directing that person to show cause at a date and time certain why an order should not be entered enforcing the administrative summons. The order should provide that unless the court determines otherwise, any motions and issues raised by the pleadings will be considered at the return date of the order to show cause. In addition, the order should state that only those issues raised in motions or brought into controversy by the responsive pleading and supported by affidavit will be considered at the return of the order and that any uncontested allegation in the complaint will be taken as admitted.

3. At the hearing on the order, the Secretary should be prepared to prove the allegations of the complaint that the summons complies with the Powell requirements. He should also be prepared to rebut any proper defenses asserted by the person summoned.

The person summoned should be prepared to produce any evidence rebutting the government's case and also to assume the burden as to affirmative issues raised by him for the purpose of demonstrating that enforcement of the summons would constitute an abuse of the court's process. After completion of the hearing, the district court in conformity with [Federal Rule of Civil Procedure] 52(a), should make the requisite findings of fact and conclusions of law.

4. Although the proceedings are of a summary nature, if the district court concluded that it could not fairly decide the case on the record before it at the return of the order, it would be free to direct further proceedings, including discovery, if requested.

---

[4] The "Powell test" is a reference to *United States v. Powell*, 379 U.S. 48 (1964), discussed below.

*United States v. McCarthy*, 514 F.2d 368, 372–73 (3d Cir. 1975) (Seitz, C.J.) (footnote added) (footnote from original omitted); *accord United States v. Genser*, 582 F.2d 292, 302 (3d Cir. 1978) (endorsing *McCarthy*; noting that "[o]ther courts have established similar procedures"). The *McCarthy* court clarified that although its procedure contemplated an evidentiary hearing, "implicit in our design is the realization that not every summons enforcement proceeding will require an evidentiary hearing." 514 F.2d at 373. The court observed that "if the person summoned neither puts in issue allegations of the complaint nor raises proper affirmative defenses, no evidentiary hearing will be required; the matter can be decided on the pleadings." *Id.*

In a somewhat more recent decision, the United States Court of Appeals for the Third Circuit described the process for enforcing an administrative subpoena in similar terms:

- "The agency seeking enforcement must first file a complaint alleging compliance with the [requirements for issuing an administrative subpoena under *Powell*] and an affidavit of the agent who issued the subpoena verifying those allegations." *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 128 (3d Cir. 1981).

- "The person subpoenaed is then served, and finally a hearing is held during which the government must prove its compliance with the [requirements for issuing an administrative subpoena under *Powell*]." *Id.*

- "If the government makes this preliminary showing, the burden then shifts to the respondent to prove that enforcement of the subpoena would be improper . . . ." *Id.*

- "After these proceedings, the district court must make findings of fact and conclusions of law in conformity with [Federal Rule of Civil Procedure] 52(a), but if the record as then constituted is inadequate to dispose of the action, the trial judge may, in his discretion and on request, direct further proceedings including discovery." *Id.*

27

- "The trial judge must evaluate the assertions of the recipient of the subpoena and any evidence introduced by both parties before allowing substantial discovery. This procedure requires the respondent to bear the initial burden of convincing the trial judge that the claimed abuse of process is not frivolous." *Id.* (citations omitted).

*See also United States v. Gertner*, 65 F.3d 963, 966–68 (1st Cir. 1995) (describing similar framework); *cf. United States v. Morton Salt Co.*, 338 U.S. 632, 637 (1950) (noting that after the United States filed actions to enforce information requests issued by the Federal Trade Commission, the responding parties answered, the parties filed cross motions for summary judgment, and the court ruled on the cross motions because there was no dispute as to the material facts). The Department's description of how enforcement proceedings unfold only contemplates the filing of a complaint, followed by a motion to quash and briefing on the motion to quash, then culminating in a hearing on those papers without the taking of any evidence, and the immediate issuance of a final, appealable order. That is inconsistent with the federal scheme.

In the abstract, the *McCarthy* and *Wheeling-Pittsburgh* decisions describe a method of proceeding that fits well with the Court of Chancery Rules, albeit one that the parties did not follow here. The immediately pressing question is how to proceed in this case.

During oral argument, AT&T cited *Blue Hen* and referenced the possibility that if the court had concerns about the scope of the Subpoena, then the Department might wish to provide additional justification. Dkt. 30 at 30–33. The Department rejected that route, insisting that it wanted a final, appealable order. *Id.* at 34–37, 39–42, 61. In a similar situation where a government agency not only did not seek an evidentiary hearing but

affirmatively opposed it, the United States Court of Appeals for the First Circuit held that a district court had acted within its discretion by not holding an evidentiary hearing and deciding the case based on the agency's complaint and supporting submissions. *See Gertner*, 65 F.3d at 969–70.

Given the Department's position, this decision evaluates the Department's application to enforce the Subpoena based solely on the allegations of the complaint. If those allegations do not support the requested relief, then the relief will be denied.

Similarly, because of AT&T's decision to file a motion to quash or modify, this decision will not give AT&T an opportunity to raise further arguments in opposition to the Subpoena. As the responding party, AT&T was in a position to know whether compliance would be unduly burdensome or implicate other fact-based complications. When it filed the Motion, AT&T could have raised fact-based objections in addition to its legal arguments. AT&T did not need any discovery to do so; it could have submitted affidavits and supporting documents with the Motion. Although the *McCarthy* procedures contemplate a different procedural means by which the responding party would raise issues, the parties have not followed that framework.

Giving AT&T a second bite at the apple would be inconsistent with "an expeditious resolution of the action." 12 *Del. C.* § 1171(4). AT&T is therefore limited to the legal arguments it raised in the Motion. This ruling is not prejudicial to AT&T, because requiring a party opposing a subpoena to come forward with all of its objections at once comports with how courts approach motions to quash or modify under Rule 45 or

29

in miscellaneous actions to enforce out-of-state subpoenas. As noted, AT&T does not appear to have contemplated making further fact-based arguments.

### 1. The Legal Framework

This court has not previously articulated the legal framework that governs an action to enforce an administrative subpoena under the Escheat Law. As Vice Chancellor Slights recently suggested, the proper course is to look to the "well-developed common law standards in Delaware for enforcing subpoenas," including the "abundant authority with respect to the parameters for enforcement of administrative subpoenas generally." *Univar Chancery III*, 2020 WL 2569703, at *4 & n.47.

When the legislature gives an administrative agency the power to subpoena, it has given the agency "a power of inquisition" that is "analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Morton Salt*, 338 U.S. at 642–43; *accord In re Hawkins*, 123 A.2d 113, 115 (Del. 1956) (holding that after enacting of statute conferring power to issue subpoenas and other writs on Attorney General, "it is clear that the general investigatory powers of the grand jury are now shared, at least to a substantial extent, by the Attorney General" and that like the grand jury, the Attorney General "may institute an investigation of suspected violations of law, and in pursuing the investigation may compel the appearance of witnesses and the production of documents"). The resulting power to investigate possible wrongdoing is "'necessarily broad.'" *Blue Hen*, 314 A.2d at 200 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972)). "For these reasons, judicial review of

30

administrative subpoenas is 'strictly limited.'" *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 64 (3d Cir. 2003) (quoting *FTC v. Texaco, Inc.*, 555 F.2d 862, 872 (D.C. Cir. 1977) (*en banc*)).

An agency has authority to issue an administrative subpoena "if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *Morton Salt*, 338 U.S. at 652. Reframed in slightly different words, the agency can establish its authority to issue the subpoena by showing "that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the [agency's] possession, and that the administrative steps required by the [statute] have been followed . . . ." *Powell*, 379 U.S. at 57–58; *see State v. Salasky*, 2013 WL 5487363, at *15 (Del. Super. Sept. 26, 2013) (finding that under statute conferring subpoena power on Attorney General, "as long as the Attorney General is conducting an investigation of alleged criminal activity, they are acting within the statutory authority provided to them by the General Assembly"). It is nevertheless possible that an agency may issue a subpoena that is not sufficiently grounded in its statutory authority. *See In re McGowen*, 303 A.2d 645, 647 (Del. 1973) (quashing subpoena issued by Attorney General as beyond statutory authority). It is also possible that "a governmental investigation . . . may be of such sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Morton Salt*, 338 U.S. at 652.

If the court finds that the agency had authority to issue the subpoena, the scope of judicial review remains limited, but it is not over.

31

It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused. Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the [subject of the investigation] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation. The burden of showing an abuse of the court's process is on the [party objecting to the subpoena] . . . .

*Powell*, 379 U.S. at 58 (footnote omitted). These examples of abuse "were not intended as an exclusive statement about the meaning of good faith." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 317 n.19 (1978). "Future cases may well reveal the need to prevent other forms of agency abuse of congressional authority and judicial process." *Id.* at 318 n.20.

Decisions considering the enforcement of administrative subpoenas also evaluate the dimension of reasonableness. This requirement is often grounded in the protections supplied by the Fourth Amendment of the United States Constitution, but it flows more generally from the "real problem of balancing the public interest against private security." *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 203 (1946). For purposes of an administrative subpoena,

the requirement of reasonableness . . . comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry. Necessarily, as has been said, this cannot be reduced to formula; for relevance or adequacy or excess in the breadth of the subpoena are matters variable in relation to the nature, purposes and scope of the inquiry.[5]

---

[5] *Id.* at 209; *see id.* at 216 (explaining that analysis of scope of administrative subpoena is "essentially the same as . . . the court's in issuing other pretrial orders for the

Put differently, (i) the subpoena must "specify the materials to be produced with reasonable particularity," (ii) the subpoena must "require the production only of materials that are relevant to the investigation," and (iii) the request "must not cover an unreasonable amount of time" or otherwise be overly burdensome. *Blue Hen*, 314 A.2d at 201.

When evaluating reasonableness, courts show deference to the needs of the agency, even though "such investigations can be expensive and time consuming" for the responding party. *EEOC v. Am. Express Centurion Bank*, 758 F. Supp. 217, 221 (D. Del. 1991) (citing *Okla. Press*, 327 U.S. at 213). "Premature interruption of investigation 'would render substantially impossible [the agency's] effective discharge of the duties of investigation and enforcement'" that have been assigned to it. *Id.* at 221 (quoting *Okla. Press*, 327 U.S. at 213).

Because the reasonableness analysis has traditionally been grounded in the Fourth Amendment, and because AT&T has sought to reserve its right to litigate issues under federal law and the United States Constitution in the Federal Action, this court could conclude that reasonableness is solely a federal law issue and decline to consider it on that basis. Under *Powell*, however, this court must evaluate whether the enforcement of

---

discovery of evidence"); *id.* at 217 n.57 (noting that a court has the power to address whether the agency has "authority[]to conduct the investigation, relevancy of the materials sought, and breadth of the demand"); *id.* at 217 (reiterating that "[p]ersons from whom [an agency] seeks relevant information are not required to submit to [the agency's] demand, if in any respect it is unreasonable or overreaches the authority [the legislature] has given").

the subpoena would be "an abuse of the court's process," 379 U.S. at 58, and the enforcement of an *unreasonable* subpoena would be abusive. In addition, the Escheat Law appears to contemplate an inquiry into reasonableness by stating that a subpoena may be issued "at reasonable times and on reasonable notice," 12 *Del. C.* § 1171, and a leading authority on the Escheat Law observes that "[h]olders expect both the conduct and the review methodology employed by unclaimed property auditors to be reasonable . . . ." Ethan D. Millar et al., *Unclaimed Property*, Tax Portfolio Series (BNA) no. 1600-3d § 1600.09(F), Bloomberg Law (database updated June 2020). This decision therefore concludes that Delaware law contemplates an inquiry into the reasonableness of an administrative subpoena under the Escheat Law, albeit one that is deferential to the State Escheator.

The resulting legal framework for enforcing an administrative subpoena involves a shifting burden of proof. The agency has the initial burden of showing that its subpoena is authorized. "If the [agency] makes this preliminary showing, the burden then shifts to the respondent to prove that enforcement of the subpoena would be improper under the test enunciated in *Powell*." *Wheeling-Pittsburgh*, 648 F.2d at 128. This decision has already discussed the *McCarthy* procedures, which parties ideally would use in these settings.

At bottom, AT&T maintains that the Subpoena exceeds the authority granted to the State Escheator. The Department bears the initial burden to show that it possesses the authority to issue the Subpoena. *See Powell*, 379 U.S. at 57–58. The allocation of the burden is not significant in this case, because the question of authority raises issues of law. The one exception is the question of whether the Subpoena is so broad,

34

unreasonable, or otherwise infirm that it would constitute an abuse of the court's process to enforce it. As to this issue, AT&T bears the burden. *See LaSalle*, 437 U.S. at 316.

2. **Whether The Department Properly Exercised Authority Granted To The State Escheator.**

For an administrative subpoena to be valid, the agency must show "that the investigation will be conducted pursuant to a legitimate purpose . . . ." *Powell*, 379 U.S. at 57. Framed in slightly different terms, "the inquiry must be within the authority of the agency . . . ." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 574 (3d Cir. 1980).

AT&T advances different theories as to why the Subpoena falls outside the authority granted to the State Escheator. Individually, the theories fall short. Evaluated collectively, however, AT&T has established that the Department issued an overly broad and unreasonable subpoena such that to enforce it would abuse the court's process.

a. **Linguistic Divergence Between Section 1171 And The Complaint**

AT&T first focuses on the linguistic divergence between the language of Section 1171 and how the complaint frames the purpose of the Subpoena. This argument does not provide grounds for quashing or modifying the Subpoena.

Section 1171 gives the State Escheator the authority to "[e]xamine the records of a person or the records in the possession of an agent, representative, subsidiary, or affiliate of the person under examination in order to determine whether the person complied with [the Escheat Law]." 12 *Del. C.* § 1171(1). The complaint frames the purpose for the Subpoena in different terms. It alleges that the Department served the Subpoena to

35

"identify abandoned and unclaimed property in the custody of [AT&T] . . . to which the State is entitled to custody" and "to determine the property being held by AT&T that shall be escheated to the State pursuant to the [Escheat Law]." Compl. ¶¶ 6, 23.

AT&T argues that the Department is exceeding the authority granted to the State Escheator by seeking to identify escheatable property rather than by seeking to determine whether AT&T complied with the Escheat Law. *See* Dkt. 10 at 25. This argument is meritless. The process of examining a party's compliance with the Escheat Law necessarily involves determining whether that party has unclaimed property in its custody that should be escheated to the State of Delaware. A party who has complied with the Escheat Law will have identified and escheated any escheatable property. A party who has not complied with the Escheat Law either will not have identified escheatable property, not have escheated the property, or both. The Escheat Law authorizes the State Escheator to conduct this inquiry, and the Department can issue a subpoena for that purpose.

AT&T also complains that "[t]he Complaint does not contain a single allegation addressing why the documents requested are relevant to Delaware's unclaimed property law." *Id.* That omission is not inherently fatal, because the law governing the enforcement of agency subpoenas rejects any bright-line requirement that the agency provide an explanation for its actions or meet a standard of proof such as probable cause.

The Supreme Court of the United States addressed this issue in *Powell*. In March 1963, the Internal Revenue Service issued an administrative subpoena for records relating to tax returns from 1958 and 1959. *Powell*, 379 U.S. at 49. A three-year statute of

36

limitations barred the assessment of additional deficiencies for those years, except in cases of fraud. Because more than three years had passed, the taxpayer argued "that before he could be forced to produce the records the Service had to indicate some grounds for its belief that a fraud had been committed." *Id.* The IRS "declined to give any such indication . . . ." *Id.* The IRS then sought to enforce its subpoena and filed an affidavit from an agent stating that he "had reason to suspect the taxpayer had fraudulently falsified its 1958 and 1959 returns by overstating expenses." *Id.* at 50. The trial court enforced the subpoena, but the court of appeals reversed, holding that the IRS failed to give "probable cause" to suspect fraud. *Id.* The Supreme Court of the United States reversed the court of appeals, holding that "the Commissioner need not meet any standard of probable cause to obtain enforcement of his summons, either before or after the three-year statute of limitations on ordinary tax liabilities has expired." *Id.* at 57. The opinion used the term "probable cause" to refer not only to that level of proof in a specific legal sense, but more generally "to include the full range of formulations offered by lower courts." *Id.* at 50 n.7.

Subsequent decisions have relied on *Powell* to reject any requirement that an agency show cause before obtaining the information it seeks. *See, e.g.*, *Am. Express*, 758 F. Supp. at 221 ("The agency need not meet any standard of probable or reasonable cause."). "[A]n agency ordinarily 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *Univ. of Med. & Dentistry*, 347 F.3d at 64 (quoting *Powell*, 379 U.S. at 57). "'Judicial supervision of agency decisions to investigate might hopelessly entangle the courts in areas that would

prove to be unmanageable and would certainly throw great amounts of sand into the gears of the administrative process.'" *Wheeling-Pittsburgh*, 648 F.2d at 127 n.12 (quoting *Dresser Indus., Inc. v. United States*, 596 F.2d 1231, 1235 n.1 (5th Cir. 1979)).

Delaware decisions take the same view. *See Blue Hen*, 314 A.2d at 201 (recognizing that defendant "fail[ed] to point to any case that would support its position that subpoenas duces tecum must be supported with probable cause"). In *Hawkins*, the recipient of a subpoena from the Attorney General objected that "the subpoena fails to show on its face the subject matter of the investigation to which the demanded records relate."123 A.2d at 116. The recipient argued that "a witness is entitled for his own protection to know the nature of the inquiry and the purpose of the subpoena so that he may challenge its propriety if he so desires." *Id.* The Delaware Supreme Court rejected this argument:

> The simple answer to this contention is that the limits of the investigation and the relevancy of the documents sought are matters which are of no concern to the witness. Such is the rule when a witness is called before a grand jury, and we think it equally applicable when he is summoned before the Attorney General.

*Id.* (citation omitted).

A statute certainly could require an agency to provide some reason or make some showing before conducting an investigation or obtaining an order enforcing a subpoena. The Escheat Law does not contain any such requirement. Section 1171 does not require the State Escheator to have any purpose for seeking documents beyond "determin[ing] whether the person complied with [the Escheat Law]." 12 *Del. C.* § 1171(1).

These authorities demonstrate that an agency does not inherently exceed its authority by failing to provide an explanation for its investigation or a justification for its information requests. These general rules do not mean that an agency can *never* be required to make some showing or provide some explanation before a court will enforce its subpoena. In *Blue Hen*, the Attorney General issued an administrative subpoena seeking information from Blue Hen Country Network, Inc. and its president. Blue Hen had been formed only two years earlier, and the firm raised capital by selling securities. The Attorney General's stated purpose for the subpoena was its "continuing investigation of sales of securities within the State of Delaware to determine if materially misleading or fraudulent representations have been made in connection with the offerings thereof." *Blue Hen*, 314 A.2d at 199 (internal quotation marks omitted). The Attorney General had issued the subpoena pursuant to its statutory power "'to investigate matters involving the public peace, safety and justice, and to subpoena witnesses and evidence in connection therewith . . . .'" *Id.* (quoting what is now 29 *Del. C.* § 2504(4)). The subpoena instructed Blue Hen's president to "appear at the office of the Attorney General . . . and to bring with you all stock records, stock transfer records, books of account, and minutes of Directors' meetings of Blue Hen . . . and its subsidiaries." *Id.* (internal quotation marks omitted).

Blue Hen and its president challenged the subpoenas on multiple grounds. For purposes of this decision, the relevant challenge was their claim that the subpoena was both "unconstitutionally broad" and inconsistent with "the Fourth Amendment prohibition against unreasonable searches and seizures." *Id.* The trial court concluded that

the Attorney General had authority to issue the subpoenas, reasoning that "[t]he purpose stated by the Attorney General . . . is a proper purpose under the statute," and the statute was constitutional. *Id.* at 200. The trial court also concluded that it was "not unreasonable to require the production of materials covering the two year period of its corporate existence." *Id.* at 202. But the trial court observed that "[w]hile it is clear that stock records and stock transfers would contain information relevant to stock sales, it is not clear that books of account and minutes of directors' meetings, in general, would contain information relevant to the investigation." *Id.* The court therefore directed the Attorney General to "submit justification for the production of those records." *Id.*

As *Blue Hen* demonstrates, a court can take into account the fact that an agency has not provided an explanation or a justification when evaluating whether it would be an abuse of the court's process to enforce a subpoena. If an agency has served a wide-ranging request, and if the responding party has raised valid concerns about the request, then as in *Blue Hen*, some form of explanation or justification may be warranted before a court will enforce the subpoena.

### b. Records Of Rebates And Checks Where Any Claim For Escheat Would Be Barred By The Statute Of Limitations

In its second argument, AT&T maintains that the Department exceeded the authority granted to the State Escheator by seeking information for years that are barred from assessment under the applicable statute of limitations. Framed in this bright-line fashion, this argument does not provide grounds for quashing or modifying the Subpoena.

Analyzing AT&T's argument requires determining whether the statute of limitations in fact would bar the State Escheator from issuing a notice of deficiency and escheating abandoned property for any of the years that the Subpoena covers. If the statute of limitations would not bar the claim, then AT&T's argument fails on its own terms.

Before July 22, 2002, the Escheat Law did not impose a statute of limitations restricting the State Escheator's ability to recover unclaimed property. Millar et al., *Unclaimed Property*, *supra*, § 1600.05(J)(1). Under this regime, the State Escheator in theory could recover property that should have been escheated at any point in history. No one argues that the pre-2002 regime applies to this case.

In 2002, the General Assembly amended the Escheat Law by imposing a statute of limitations tied to the filing of annual reports. A holder of escheatable property is required to file an annual report on March 1 of each year and describe "property presumed abandoned and subject to the custody of the State Escheator." 12 *Del. C.* § 1142(a); *see id.* § 1144(a). Under the 2002 amendments, the State Escheator could recover unreported unclaimed property only if the State Escheator issued a notice of deficiency for an annual report. 73 Del. Laws ch. 417, § 1 (2002). In ordinary circumstances, the State Escheator had three years to issue a notice of deficiency. *Id.* If "an omission of abandoned or unclaimed property from a report ha[d] a value in excess of 25 % of the amount of abandoned or unclaimed property disclosed in [the] report," then the State Escheator had six years. *Id.* And if "no report [was] filed, or if a false or fraudulent report [was] filed with the intent to evade the obligation to pay over

41

abandoned property," then the State Escheator could issue a notice of deficiency at any time. *Id.* If the State Escheator failed to issue a notice of deficiency within the statutory time period, then it was barred from suing to recover the unclaimed property. This decision refers to this regime as the "Old Statute of Limitations."

Effective February 22, 2017, the 2017 Amendments changed the limitations period. As amended, the Escheat Law prohibits the State Escheator from "commenc[ing] an action or proceeding to enforce . . . the reporting, payment, or delivery of property more than 10 years after the duty arose." 12 *Del. C.* § 1156(b). As amended, the Escheat Law also provides that the "period of limitation established . . . is tolled by the State Escheator's delivery of a notice of an examination . . . , or if the State Escheator reasonably concludes that the holder has filed a report containing a fraudulent or willful misrepresentation." *Id.* This decision refers to this regime as the "New Statute of Limitations."

The Department began its current examination of AT&T in 2012. Thus, if the New Statute of Limitations were to apply, then the commencement of the investigation would toll the statute of limitations, and the State Escheator could recover property that became escheatable as far back as 2002. The State Escheator would not be able to recover property that became escheatable during years pre-dating 2002.

AT&T contends that when the 2017 Amendments amended the statute of limitations effective February 22, 2017, the three-year default period under the Old Statute of Limitations had already run for any report filed on February 21, 2014, or earlier, *i.e.*, three years or more before the amendment. AT&T filed a report on March 1,

42

2014, which is subject to the New Statute of Limitations, but AT&T maintains that its reports for earlier years are subject to the Old Statute of Limitations. The State Escheator has never issued a notice of deficiency for any of its earlier reports, so AT&T maintains that the three-year statute of limitations applies to the reports filed in 2013 or earlier.

In this case, the Department is investigating property that takes the form of rebates or checks issued in connection with employee compensation. *See* Compl. Ex. J. Both forms of property are presumed abandoned five years after issuance.[6] AT&T reasons that to be escheatable, a rebate or check would have had to be issued at least five years before the applicable report was filed. Under AT&T's theory of how the Old Statute of Limitations worked, the latest report that the State Escheator could pursue was filed in 2013 and covered rebates and checks issued through December 31, 2007. AT&T

---

[6] For checks, the Escheat Law specifies the five-year period. 12 *Del. C.* § 1133(11). For rebates, the analysis is more complicated. Before the 2017 Amendments, rebates were escheatable under the "catch-all" provision of the Escheat Law. *See* 12 *Del. C.* § 1198(11) (2016); *Staples, Inc. v. Cook*, 35 A.3d 421, 424–27 (Del. Ch. 2012) (finding that rebates at issue were "either 'bills of exchange' or 'credits,' and therefore properly subject to escheatment by the State"); *see also* Millar et al., *Unclaimed Property*, *supra*, § 1600.04(M) (explaining that ordinarily "a rebate is subject to escheat under the state's 'catch-all' provision"). After the 2017 Amendments, rebates which cannot "be redeemed for money or otherwise monetized by the issuer" are no longer escheatable property. 12 *Del. C.* § 1130(11) (including "rebate" in the definition of "loyalty card"); *see id.* § 1130(18) (excluding "loyalty card" from the definition of "property"). AT&T has not argued, and this decision does not address, whether the 2017 Amendments apply retroactively to rebates issued before the amendments went into effect. Both parties proceeded as if the rebates are presumed abandoned after five years. *See* Dkt. 30 at 28, 38–39; Dkt. 10 at 28, 34.

43

concludes that the State Escheator cannot recover any rebates or checks from that date or earlier (*i.e.*, before 2008).

Having reasoned in this fashion, AT&T asserts that the Department should not be able to demand information for years in which the State Escheator would not be able to recover escheatable property. The Subpoena seeks records dating back to 1992.[7] AT&T concludes that the Subpoena therefore exceeds the authority granted to the State Escheator.

Under the Old Statute of Limitations, if the State Escheator could prove the value of the checks and rebates exceeded the total value of unclaimed property disclosed in an

---

[7] On November 26, 2019, representatives from AT&T met with the State Escheator to discuss the scope of the Subpoena. In a letter sent to the State Escheator the next day, AT&T expressed its understanding that "Delaware's revised request for documents is limited to 2008 and forward. . . . That is, Delaware is not requesting data for periods prior to 2008, nor is it requesting that AT&T confirm whether it can access or research such data." Dkt. 10 Ex. H at 1. When the Department filed this action to enforce the Subpoena, the Department did not limit its request to documents from 2008 forward. *See* Compl. Ex. J. In its opening brief, AT&T asserted that the Subpoena seeks records dating back to 1992 and devoted eight pages of briefing to the relevant statute of limitations. *See* Dkt. 10 at 26–34. In its answering brief, the Department did not challenge AT&T's assertion that the Subpoena seeks records dating as far back as 1992. *See* Dkt. 16 at 23–26. In its reply, AT&T spent another three pages responding to the Department's arguments about the statute of limitations. At oral argument, counsel for the Department asserted for the first time that the Rebates Request only seeks records dating back to 1998 and the Disbursements Request only seeks records dating back to 2008. Dkt. 30 at 38–39. Counsel for AT&T expressed surprise, indicating that "AT&T has been trying to get the Department to commit only to look back to 2008 in requesting records" but that the Department "has refused to do so." *Id.* at 71. Because the narrowing of the requests was not raised until oral argument, and because the Department did not explain its position, this decision treats the Subpoena as seeking records dating back to 1992.

annual report by 25%, then the Old Statute of Limitations would increase from three years to six, bringing into play reports filed in 2010 and covering rebates and checks issued through December 31, 2004. And if the State Escheator could prove AT&T filed a report fraudulently with the intent to evade the obligation to turn over abandoned property, the State Escheator could recover any checks or rebates that should have been covered by that report. AT&T's answer to these problems is that the complaint does not allege any basis to think that AT&T's reports were off by 25% or more or filed fraudulently. Ironically, under AT&T's reasoning, the State Escheator could sue to recover checks or rebates issued before 1994, because AT&T did not start filing reports until 1999, but neither AT&T nor the Department has addressed that possibility.

The Department responds to AT&T's laborious analysis with a single sentence, devoid of authority or argument. According to the Department, "[t]he new Escheats Law applies to this examination." Dkt. 16 at 24. As discussed above, the New Statute of Limitations would allow the State Escheator to seek records of checks or rebates covered in the 2002 report and therefore issued as early as 1997.

The Department has not provided any grounds for applying the New Statute of Limitations retroactively. Doing so would break with the "time-honored principle that [Delaware courts] 'will not infer an intention to make an act retrospective,' and that 'to give an act a retrospective operation would be contrary to well settled principles of law applicable to the construction of statutes unless it be plainly and unmistakably so provided by the statute.'" *Chrysler Corp. v. State*, 457 A.2d 345, 351 (Del. 1983) (quoting *Keller v. Wilson & Co.*, 190 A. 115, 125 (Del. 1936)). Nothing in the statute or

45

the legislative history indicates that the General Assembly intended for the retroactive application of the New Statute of Limitations. *See* Del. S.B. 13 syn., 149th Gen. Assem. (2017). Instead, the effective date of February 22, 2017, suggests the opposite. That was the position that the State Escheator took in connection with the 2002 amendments. Then, the State Escheator agreed that "no statute of limitations applie[d] for periods for which reports were filed prior to July 22, 2002," and that the new statute of limitations applied for reports filed after the effective date. Millar et al., *Unclaimed Property*, *supra*, § 1600.05(J)(1).

It thus appears correct that there are reports covering years for which the Old Statute of Limitations would bar the State Escheator from seeking to recover escheatable property. But AT&T's bright-line argument that the statute of limitations bars the Department from investigating those years runs contrary to precedent.

The decision in *Powell* again provides the answer. To recap the facts, the IRS issued an administrative subpoena for records for years where it could not assess any deficiencies under a three-year statute of limitations. *Powell*, 379 U.S. at 49. The statute of limitations created an exception for cases of fraud, and the taxpayer argued that the IRS should have to provide some "grounds for its belief that a fraud had been committed" before investigating years for which an assessment otherwise would be barred. *Id.* The IRS declined to give any explanation and sought to enforce the subpoena. *Id.* at 49–50. The trial court enforced the subpoena, but the court of appeals reversed, holding that the IRS lacked "probable cause" to suspect fraud. *Id.* at 50. The Supreme Court of the United States reversed the court of appeals and held that "the Commissioner need not meet any

46

standard of probable cause to obtain enforcement of his summons, *either before or after the three-year statute of limitations on ordinary tax liabilities has expired*." *Id.* at 57 (emphasis added).

Subsequent decisions have relied on *Powell* to reject any bright-line limitation on an agency's authority to conduct an investigation based on the running of the statute of limitations that would apply if the agency sought a remedy. The Delaware District Court addressed this issue in *EEOC v. Delaware State Police*, 618 F. Supp. 451 (D. Del. 1985). The agency sought information dating back three years, but a two-year statute of limitations applied to charges unless the agency could show willfulness. The defendant argued that the agency should be limited to two years of information. *Id.* at 453. Chief Judge Schwartz explained that "[a] party may not defeat an agency's authority to investigate by raising what could be a defense if the agency subsequently decides to bring an action against the party" and held that "[i]t would be an inappropriate exercise of judicial power in an administrative subpoena enforcement proceeding to determine the merits of a statute of limitations defense that might be raised to a hypothetical future complaint . . . ." *Id.*; *accord EEOC v. Karuk Tribe Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001) ("A party may not defeat agency authority to investigate with a claim that could be a defense if the agency subsequently decides to bring an action against it." (internal quotations marks and alterations omitted)).

The statute of limitations thus does not operate as a bright-line rule that leads to a finding that a subpoena is unauthorized if the agency seeks records that are outside the limitations period. But that fact does not become irrelevant to the Department's ability to

47

conduct an investigation. The State Escheator only has authority to examine records "to determine whether the person complied with [the Escheat Law]." 12 *Del. C.* § 1171(1). If it appears highly unlikely, even impossible, that the State Escheator could reach property from a given year, then it becomes more likely, all else equal, that the subpoena is improper. The extent to which an information request goes beyond the statute of limitations thus becomes part of the inquiry into whether it would represent an abuse of the court's process to enforce a subpoena, absent some creditable explanation addressing how the information would be used.

### c. Records Of Checks Issued To Parties Whose Last Known Addresses Would Not Result In Escheatable Property

Similar reasoning applies to AT&T's third argument. The Subpoena requests information about "all checks issued." Compl. Ex. J. Ex. 1. As framed, it encompasses checks issued to parties with addresses in other states. AT&T contends that the State Escheator lacks authority to investigate checks issued to payees with addresses located in states other than Delaware because the State Escheator only has standing to escheat property where the company's records show no last-known address, a Delaware address, or an address in a state that does not have an escheat law. As with the statute of limitations, this defense to an enforcement action does not apply as a matter of law at this stage.

Under the Supreme Court of the United States' decision in *Texas v. New Jersey*, as applied by this court in *Nellius v. Tampax, Inc.*, 394 A.2d 233 (Del. Ch. 1978), AT&T's description of the governing law appears correct. In *Nellius*, the State Escheator sought to

48

escheat certain shares of Tampax, Inc. and dividends associated with those shares. According to the company's records, Tampax had originally issued 200 shares of stock in 1941 to William C. Russell at an address in Canton, Massachusetts. *Id.* at 234. Sometime thereafter, Russell transferred the shares to a man named Cronin, but notice of the transfer was never given to Tampax. As a result, the company's records always reflected Russell as the owner. In 1945 and 1946, Tampax mailed four separate dividend checks to Russell. Each time, he returned the check and informed Tampax that he had sold the shares. Tampax stopped sending further dividends to Russell. As of 1978, the original 200 shares had grown through stock splits and stock dividends to 7,200 shares, and Tampax was holding $145,072 in cash dividends payable on those shares. Tampax had reason to believe that the "Cronin" in question was a John G. Cronin, who had died in 1944. *Id.* at 234–35.

The State Escheator argued that on the facts presented, the address of the owner of the shares was unknown, and so the shares and associated dividends should escheat to Delaware. This court held that "the existence of Russell's name and his Massachusetts address on the records of Tampax bars the State of Delaware from bringing this action to escheat the stock and accumulated dividends despite the State Escheator's contention . . . that the address of the last actual owner of the original two stock certificates is unknown . . . ." *Id.* at 237.

The Department suggests that the *Nellius* court reached this conclusion because the Delaware General Corporation Law affords special status to a corporation's list of stockholders to determine who are the record holders of its shares. Dkt. 30 at 59–60. That

49

is not correct. The *Nellius* court reasoned that this holding was mandated by the decision of the Supreme Court of the United States in *Texas v. New Jersey*, which established priorities for which state is entitled to escheat abandoned property. The Supreme Court of the United States had previously held that "the Due Process Clause of the Fourteenth Amendment prevents more than one State from escheating a given item of property." *Nellius*, 394 A.2d at 235 (citing *W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71 (1961)). In *Texas v. New Jersey*, the Supreme Court of the United States considered what rules should govern intangible property, taking into account the competing claims of the state of incorporation, the state of the company's principal place of business, the state where the documents evidencing the property were physically located, and the state where the owner's last known address was located. *See* 379 U.S. at 678. Any dispute between the states over which jurisdiction could escheat property would invoke the original jurisdiction of the Supreme Court of the United States, so that court sought to establish clear rules that would govern the competing claims. *Id.* at 675, 683.

The Supreme Court of the United States held initially that an item of intangible property "is subject to escheat only by the State of the last known address of the [owner], as shown by the [company's] books and records." *Id.* at 682. The Court then held "where there is no last known address," then the property is "subject to escheat by the State of corporate domicile . . . ." *Id.* If the state of the last known address did not provide for escheat, then the property was again subject to escheat by "the State of corporate domicile." *Id.*

In *Nellius*, this court held that the State Escheator's effort to claim that the Tampax shares had no known address ran afoul of the ruling in *Texas v. New Jersey*:

> Viewed hypothetically, if the issue here was between Massachusetts and Delaware as to which of them had the prior right to escheat the stock and accumulated dividends, Delaware would have to prove those very evidentiary elements on which the State Escheator is relying here in his effort to defeat the motion for summary judgment, namely, Russell's rejection of the various dividend checks in 1945 and 1946, Russell's deposition testimony as to what he did and what he recollected, the certified copies of the probate records of John G. Cronin's estate, etc. In other words, it would be Delaware's burden to establish by sufficient evidence that the last Actual owner of the stock was a person, known or unknown, other than the owner shown of record on the stock ledger of Tampax. This appears to be the type of situation that the rationale behind the primacy rules of *Texas v. New Jersey* sought to avoid.

*Nellius*, 394 A.2d at 237. This court therefore held that the State Escheator lacked standing to dispute the last known address of the owner of the shares as it appeared on Tampax's records. *Id.* at 235.

Under *Nellius*, the State Escheator could not attempt to look behind the last known address of a check recipient as it appears on AT&T's records. Under *Texas v. New Jersey*, the State Escheator can only seek to escheat property where (i) the last known address is in Delaware or (ii) the company is domiciled in Delaware and (a) there is no last known address or (b) the last known address is in a jurisdiction that does not escheat property. The Escheat Law memorializes these rules. *See* 12 *Del. C.* §§ 1140, 1141(a).

The problem for AT&T is that the issue of standing recognized in *Nellius* applies when the State Escheator seeks to escheat property, not when the State Escheator is conducting an investigation to determine compliance with the Escheat Law. As with the statute of limitations, *Nellius* is a defense to an enforcement action, not an investigation.

51

But as with the statute of limitations, the two issues are interrelated. Because the State Escheator can never reach property that does not fall into one of the escheatable categories, the State Escheator acts at the outer limit of its auditing authority when it requests records involving that type of property. The State Escheator might have grounds to request the information. For example, although the parties did not brief the issue, it seems likely that *Nellius* and *Texas v. New Jersey* assume that a company has not engaged in a pattern or practice of fraud when recording addresses on its books and records. A legitimate concern with investigating fraud might warrant some inquiry into records relating to property that does not fall into one of the escheatable categories. All else equal, however, a broad request for information concerning property that does not fall into any escheatable category makes it more likely that enforcing a subpoena would be an abuse of this court's process.

### d.     Records Of Cleared, Stopped, And Cancelled Checks

In what is becoming a refrain, the same reasoning applies to AT&T's fourth argument. The Subpoena requests all records of checks issued, whether they were "cashed, voided, stopped, voided and reissued, [or] still outstanding." Compl. Ex. J. Ex. 1. AT&T argues that as framed, the request encompasses property that was not abandoned. According to AT&T, the Department's request therefore exceeds the authority granted to the State Escheator.

In the Motion, AT&T contends that the Department should not be permitted to examine payments that have been voided or marked cleared. According to AT&T, the Department is effectively presuming that checks which are neither voided nor cleared

52

within thirty days of issuance constitute unclaimed property. *See* Dkt. 10 at 39. AT&T contends this presumption is unwarranted, asserting that the information request somehow "adjudicate[s] property rights" and "impose[s] [the Department's] own accounting standards" on AT&T. *Id.* AT&T takes the extreme view that that the State Escheator cannot seek information about "*potential* or *disputed*" escheatable property, but "[o]nly 'fixed and certain' amounts clearly owed to a third party and abandoned by that party." *Id.* at 38.

Section 1171 gives the State Escheator the authority to conduct investigations "in order to determine whether the person complied with [the Escheat Law]." 12 *Del. C.* § 1171(1). Determining compliance necessarily includes investigating potential or disputed escheatable property.

In the abstract, it seems apparent why an auditor would seek records regarding "still outstanding" checks. Those checks are by definition unclaimed. It likewise seems apparent why the Department would seek records regarding voided or stopped checks, because it is possible that those checks were voided or stopped because the property was abandoned.

Similar reasoning does not apply to voided-and-reissued checks, because the reissued check replaces the original voided check. Similar reasoning also does not apply to cleared or cashed checks. Cleared checks are not unclaimed; they have been deposited. Cashed checks are not unclaimed; they have been cashed.

During oral argument, the Department hinted at a reason for requesting these records by analogizing its audit of AT&T to an IRS audit. If the IRS were examining

whether a taxpayer properly reported all of its taxable income, the IRS would not only request documents about taxable categories of income. The IRS logically would request information about all types of income so that it could verify how the taxpayer was categorizing income. *See* Dkt. 30 at 44–45. The Department could be viewed as making an analogous request not only for records about escheatable categories of property, but also for records about property that has been categorized as non-escheatable. One can hypothesize that the Department might want voided-and-reissued checks, cleared checks, and cashed checks simply to verify the accuracy of AT&T's categorizations. An investigation of this type would fall within the authority granted to the State Escheator.

AT&T contends that permitting the State Escheator to investigate the voided checks "shifts the burden of proof to AT&T to show that all checks issued were not abandoned." Dkt. 18 at 12; *accord* Dkt. 10 at 39. To the contrary, AT&T only has the burden to produce records. The State Escheator has the burden to show that a check was improperly voided because it was unclaimed. Only by doing so can the State Escheator carry its "burden of proof as to the existence and amount of the [unclaimed] property and its abandonment . . . by showing evidence of the unpaid debt or undischarged obligation and passage of the requisite period of abandonment." 12 *Del. C.* § 1175(a).

AT&T also contends that because it is already subject to regulatory and financial oversight, this court should infer that "AT&T only voids a check because it is not owed[,] not a true liability." Dkt. 18 at 12 n.12. Mistakes happen. The State Escheator has broad authority to examine AT&T's records to determine compliance with the Escheat Law, including the authority to determine if AT&T is properly voiding checks.

54

The request for records of "all checks issued" is certainly broad. It falls within the authority granted to the State Escheator, but the expansive nature of the request will be taken into account when evaluating whether enforcing the Subpoena would be an abuse of this court's process.

### e. The Obligation To Produce A Spreadsheet

According to AT&T, the Rebates Request exceeds the authority granted to the State Escheator because it asks AT&T to create documents that do not exist. AT&T accepts that it has an obligation to produce documents, but it maintains that it does not have any obligation to create new documents to satisfy the request. Dkt. 10 at 40. AT&T misconstrues the request, which does not exceed the authority granted to the State Escheator.

The Rebates Request asks AT&T to "[u]tilize the Excel file embedded [in the letter] to organize [AT&T's] responses to the" request to "[i]ndicate whether each [of AT&T and the Affiliates] utilizes a [third party administrator] for issuance of rebates" and to "[i]dentify by name and number all [general ledger] accounts used by [AT&T] to track its rebate accrual and expense activity along with the period of time . . . each account was utilized to track this activity." Compl. Ex. J Ex. 2 at 2. The Rebates Request also asks AT&T "[f]or each [general ledger] account identified . . . , [to] provide in Excel format the individual transaction detail . . . posted to the [general ledger] account for the time periods indicated." *Id.* at 3. Finally, the request asks for "the associated annual system screen print for each [general ledger] account identified . . . that will reconcile the transaction detail provided . . . ." *Id.*

As a general rule, a party responding to a document request is "not required to create documents that do not exist, simply for the purposes of discovery."[8] That said, a responding party may be required to query a database to extract and export information when reasonably requested. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co. Ltd.*, 2013 WL 4426512, at *3 (N.D. Cal. Aug. 14, 2013); *Google*, 234 F.R.D. at 683. Querying a database and extracting or exporting information does not constitute the creation of a new document. It is how a party accesses an electronic records-keeping system in the ordinary course of business.

Although the requests could have been framed more clearly, the court construes the requests as asking AT&T to pull information from existing databases and other records and provide that information in an electronically usable format. Dkt. 16 at 30–31. That is a permissible request.

AT&T objects that the Rebates Request literally asks AT&T to "fill in the cells of an excel schedule that Kelmar created." Dkt. 10 at 40. The Escheat Law confers on the State Escheator the power to conduct depositions. *See* Dkt. 30 at 63; *see also* 12 *Del. C.* § 1171(2) (permitting the State Escheator to "[t]ake testimony of a person, including a person's employee, agent, representative, subsidiary, or affiliate, to determine whether

[8] *Gonzalez v. Google, Inc.*, 234 F.R.D. 674, 683 (N.D. Cal. 2006); *accord IQVIA, Inc. v. Veeva Sys., Inc.*, 2019 WL 6044938, at *6 (D.N.J. Nov. 14, 2019); *Mervyn v. Atlas Van Lines, Inc.*, 2015 WL 12826474, at *5 (N.D. Ill. Oct. 23, 2015); *Van v. Wal-Mart Stores, Inc.*, 2011 WL 62499, at *1 n.1 (N.D. Cal. Jan. 7, 2011); *Alexander v. FBI*, 194 F.R.D. 305, 310 (D.D.C. 2000).

the person complied with [the Escheat Law]"). The Department could exercise that power, depose a series of AT&T officials, and have them provide the information so that the Department could create the spreadsheet, but that would be a far more onerous request. Asking AT&T to populate the spreadsheet is a more efficient means of reaching the same result.

A request that asked a party to populate an Excel spreadsheet manually with millions of transactions would be abusive. In this case, a reasonable interpretation of the Rebates Request is that AT&T can export the information into an accessible format. AT&T has not argued that the request is overly burdensome, only that it technically exceeds the authority granted to the State Escheator. The request to query an electronic database and export the information into a usable format such as an Excel spreadsheet does not exceed the authority granted to the State Escheator.

### f.        Enforcement As An Abuse Of The Court's Process

Even when an agency has the legal authority to issue an administrative subpoena and seek the information it contains, a court can decline to enforce the subpoena if doing so would result in "an abuse of the court's process." *Powell*, 379 U.S. at 58. There is no bright-line test for abuse, nor is there an exclusive list of abusive practices. *La Salle*, 437 U.S. at 317 n.19, 318 n.20. A subpoena can be abusive if it is "issued for an improper purpose, such as to harass the taxpayer or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58. A subpoena can also be abusive if its demands for

information are "so obviously pretextual or insatiable" as to extend "beyond a legitimate inquiry." *Marathon*, 876 F.3d at 501.

One factor that can suggest abuse is if the agency appears to be "pursuing a claim it knows it cannot win" on the merits. *Wheeling-Pittsburgh*, 648 F.2d at 127. Another factor is when an agency supports its request for information with only "the bareboned allegations needed for the government's prima facie showing." *Gertner*, 65 F.3d at 968. Although such a showing may be "enough to satisfy the government's [initial] burden," that tactical decision can "come back to haunt the proponent if it is not later supplemented by more hearty fare once the challenger succeeds in [its rebuttal]." *Id.* (citation omitted). "[M]inor irregularities . . . do not rise to the 'abuse of process' level," provided "that there is no question about the basic legitimacy of the agency's investigation." *In re EEOC*, 709 F.2d 392, 402 (5th Cir. 1983).

Here, a combination of factors supports a finding that to enforce the Subpoena would be an abuse of this court's process. The Subpoena is expansive, both as to the time period it covers and the subject matter it embraces. Temporally, the Department requests records of rebates and checks going back to 1992. The Department did not provide any rationale for seeking information going back so far. The period covered extends *sixteen years* beyond the point at which the Old Statute of Limitations would prevent the State Escheator from recovering unclaimed property. The Department did not offer any reason why the Old Statute of Limitations would have been displaced by the New Statute of Limitations, choosing merely to assert in *ipse dixit* fashion that the New Statute of Limitations applied. Even if it did, the request extends five years beyond the point at

which the New Statute of Limitations would prevent the State Escheator from recovering unclaimed property. The Department seems to be pursuing information about property that it knows it cannot recover, and it has supported those requests with only bareboned allegations.

Similar problems infect the subject matter of the Subpoena. Covering the full temporal period, the Department asks for records regardless of whether the last-known address as reflected on AT&T's records was located in Delaware. Under *Nellius* and *Texas v. New Jersey*, records with last-known addresses outside of Delaware are almost certainly non-escheatable. Once again, the Department seems to be pursuing information about property that it knows it cannot recover, and it failed to support those requests with any creditable explanation.

Also covering the full temporal period, the Department asks for records of all checks, regardless of whether they have been marked cashed, cleared, voided, stopped, reissued, or still outstanding. This is a massive request for information, and one would expect the Department to have articulated some rational basis for seeking it. As discussed previously, it is of course true that an agency need not provide a reason for seeking information, but when an agency makes so broad a request, it should anticipate having to proffer some justification.

It seems evident that the Subpoena will sweep in a vast amount of irrelevant data. At oral argument, the Department argued that it needs "the universe of documents," to answer questions like "How do you keep your records? Do our records check out with your general ledger?" Dkt. 30 at 54–55. The Department thus sees even irrelevant

documents as relevant to "the audit" and "the audit process." *Id.* at 55. That rationale has no limiting principle. If the Department wishes to understand how AT&T keeps its records, it could readily depose AT&T's employees or officers.

This case is also part of a larger picture. "'[I]n recent years, state escheat laws have come under assault for being exploited to raise revenue rather than' to safeguard abandoned property for the benefit of its owners." *Marathon*, 876 F.3d at 488 (quoting *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017)). Two justices of the Supreme Court of the United States have expressed concern that "states are 'doing less and less to meet their constitutional obligation to' reunite property owners with their property before seeking escheatment, even as they more aggressively go about classifying property as abandoned." *Id.* at 489 (quoting *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in denial of certiorari)). As of December 2017, "Delaware [was] 'no exception[,] as unclaimed property ha[d] become Delaware's third-largest source of revenue[.]'" *Id.* at 489 (quoting *Plains*, 866 F.3d at 536).

The preparation of the Subpoena in this case provides cause for concern. The Department delegated its investigation to Kelmar. The Rebates Request and Disbursements Request appear on Kelmar letterhead, and Kelmar appears to have drafted them and conducted the investigation. There is no indication that the Department had any meaningful involvement in the investigation. The Department appears to have lent the State Escheator's investigatory authority to Kelmar to use as it sees fit.

Kelmar is compensated contingently. That arrangement benefits the State by minimizing fixed costs, but it gives Kelmar an incentive to engage in aggressive

60

enforcement tactics. It potentially creates a pernicious incentive for Kelmar to serve broad information requests and engage in expansive audits that impose substantial burdens on companies, thereby inducing settlements that generate income for Kelmar. The breadth of the Subpoena in this case is suggestive of such tactics.

The breadth of the Subpoena also suggests that Kelmar may be furthering its own interests in other ways. Judicial decisions involving escheat indicate that Kelmar works for other states under similar arrangements. *See, e.g., Fidelity & Guar. Life Ins. Co. v. Frerichs*, 2017 WL 4863318, at \*4 (C.D. Ill. Sept. 5, 2017) (examining Kelmar's efforts to conduct "a multi-state audit performed by several states, including Illinois"); *Fidelity & Guar. Life Ins. Co. v. Chiang*, 2014 WL 6090559, at \*1–2 (E.D. Cal. Nov. 13, 2014) (examining Kelmar's auditing practices on behalf of the Controller of the State of California). Kelmar's website describes the firm as "helping unclaimed property departments across the United States." *About Kelmar*, Kelmar, https://www.kelmarassoc.com/about/ (last visited July 8, 2020). The fact that Kelmar works for multiple states supplies a potential motivation for Kelmar's insistence on obtaining records for all checks and rebates, regardless of whether or not the last-known address on AT&T's records indicates that the property would be escheatable to Delaware. Those records would be helpful to Kelmar in recovering property for other states, but helping other states recover property is not a purpose of the Escheat Law.

The Department might have good explanations on these points, but it eschewed the opportunity to provide them. The court is therefore left with the bare allegations of

61

the complaint. Based on those allegations, the court is forced to conclude that enforcing the Subpoena as written would be an abuse of the court's process.

The question therefore becomes whether to modify the Subpoena or quash it entirely. AT&T has proposed an order that would narrow the Subpoena, but the proposed limitations track the bright-line legal restrictions that AT&T claimed should confine the State Escheator's authority. This decision has rejected those bright-line limitations, and the court is not convinced that the Department's investigation needs to be constrained to such a degree. It could be warranted, for example, for the Department to seek records for a limited number of years predating the point when the statute of limitations would apply. AT&T's proposed form of order would rule that out.

Except for AT&T's order, the parties have not provided the court with any basis to narrow the Subpoena. The party to whom the court would prefer to give significant deference—the Department—has declined to offer any guidance.

The better course is therefore to quash the Subpoena in its entirety. The Department can pursue an appeal or craft a new subpoena. If the Department chooses to issue a new subpoena, and if it becomes necessary to enforce it, the court hopes that the parties will follow the procedures described by Chief Judge Seitz in the *McCarthy* case and that the Department will be willing to assist the court in understanding its requests.

### III.    CONCLUSION

The request to stay this case in deference to the Federal Action is denied. The request to dismiss this case for failure to join the Affiliates or to stay it pending joinder is denied. The request to quash the Subpoena is granted. Within ten days, the parties shall

submit a final order, agreed as to form, that implements this ruling. If there are any proceedings that are necessary to bring this action to a close at the trial level before such an order can be entered, then the parties shall submit a joint letter identifying the issues and proposing a path forward.